# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | | |
|---|---|---|
| **BOBBY SOLOMON,** | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | 5:04-CV-319 (WDO) |
| | : | |
| ANN VENEMAN, Secretary, United States Department of Agriculture, | : | |
| | : | |
| **Defendant** | : | |

## ORDER

Plaintiff Bobby Solomon, a former county director for United States Department of Agriculture (USDA) programs in Peach County, Georgia, filed this suit alleging he was terminated for discriminatory reasons: (1) because he is African-American and (2) as retaliation for his mother and brother, also African-American, being involved in a discrimination lawsuit against the USDA. Defendant USDA filed a motion for summary judgment arguing that Plaintiff was terminated for legitimate business reasons - a routine audit that revealed Plaintiff was not running his office as the USDA directed.

*Factual and Procedural Background*[1]

Plaintiff Bobby Solomon began his employment with the Farm Service Agency's office in Peach County, Georgia in July of 1986. In July of 1988 he was promoted to the

---

[1] These are the material facts presented in the record with any dispute by Plaintiff noted and with all facts construed in Plaintiff's favor as the non-movant.

1

office of County Executive Director ("CED"). A routine Non-Insured Assistance Program (NAP) Target Review was conducted in September 1999 in Peach, Bibb and Crawford Counties.[2] The errors revealed in the report were of such magnitude that John Dumas, District Director (DD), also an African-American, issued Plaintiff Solomon a letter of caution and requested him to prepare a Corrective Action Plan (CAP). The letter explained that the operation was carried out without any supervision or coordination on the work being performed; that the errors reflected in the report would result in a large dollar value of overpayments; that correction of the errors would result in unfavorable relations with the farmers involved; and, that the amount of errors found were too numerous to overlook. Plaintiff Solomon was instructed to address all errors noted, to meet with his staff to review the errors and to take whatever action was necessary to assure this magnitude of errors would not occur again.[3] Plaintiff was warned that repeated infractions would result in formal disciplinary action.

Numerous findings in the NAP Target Review, coupled with several complaints from producers concerning the administration of programs, led to a Comprehensive Review.[4] This review took 104 workdays to complete and contained more than 222 findings that exhibited Plaintiff's office was not following the correct procedures regarding documenting the

---

[2]Def. Ex. 1.

[3]Def. Ex. 2.

[4]Def. Ex. 3.

office's expenses, processing Freedom of Information Act requests, following instructions for software usage, processing claims, processing receipts and deposits, documenting meetings, processing numerous types of property assessments and acreage reports and failing to file appropriate EEOC and Civil Rights Compliance forms.[5] The Comprehensive Review was of such magnitude that it prompted the Georgia State Committee to meet with the county office personnel. In that meeting, Plaintiff was cautioned that the county office operation had to improve. Plaintiff was informed that a follow-up review would be conducted to assure that the corrective actions were carried out and completed. Plaintiff prepared the CAP that stated that items would be completed by June 30, 2000.[6]

Approximately 20 months later in November of 2001, the County Office Reviewers (COR) conducted a CAP follow-up review and found that the deficiencies noted in the Comprehensive Review had not been corrected.[7] On March 12, 2002, Plaintiff Solomon was notified he would be suspended for a period of 14 days effective April 7, 2002 for failure to follow instructions and for misconduct regarding the audit process.[8] At that point, Plaintiff Solomon started working on the CAP again, and, Defendant contends, backdating material and making false statements in an attempt to complete the CAP. On May 21, 2002, the Agency sent Plaintiff a letter warning him that the matters in his CAP had not been

---

[5]Def. Ex. 4.

[6]Def. Ex. 5.

[7]Def. Ex. 6.

[8]Def. Ex. 8.

3

completed, explaining what needed to be done to make the corrections and warning that failure to do so could result in termination.[9]

Plaintiff appealed his suspension to the Georgia State FSA Committee and was notified by letter dated June 10, 2002 that the suspension was upheld based on the belief that the penalty was appropriate considering Plaintiff's responsibilities as office manager, his job level and the comprehensive review.[10] Plaintiff failed to take the corrective actions as he had assured in his CAP and was notified by letter dated October 17, 2002 that he was being permanently terminated from his position as County Executive Director of the Peach-Bibb-Crawford County FSA Office. The letter further explained:

> As the CED of the Peach-Bibb-Crawford County FSA Office, you are responsible in maintaining efficiency and productivity of employees under your supervision. In addition you are responsible for maintaining accurate program files and ensuring that all program documents are completed correctly and in a timely manner. The COR Comprehensive Report indicated significant errors in *every major program area*. Due to your lack of attention to program and administrative details the producers of Peach-Bibb-County have been negatively impacted.[11]

Plaintiff appealed this action to the County Office Committee by letter dated December 12, 2002.[12] Plaintiff argued that he had made the corrections instructed to the best of his ability and believed he was suspended and was being terminated because of his

---

[9]Def. Ex. 7.

[10]Def. Ex. 9.

[11]Def. Ex. 10 (emphasis added).

[12]Def. Ex. 11.

4

mother's and brother's participation in the class action lawsuit against the USDA, because he had spoken with an EEO counselor after the 14-day suspension and because COC members did not like him.

In a letter dated January 28, 2003, the Chairperson for the Peach-Bibb-Crawford County FSA upheld the decision to terminate Plaintiff Solomon.[13] By letter dated February 7, 2003, Plaintiff Solomon requested that the decision be reviewed by the Georgia State FSA Committee.[14] The State Committee unanimously voted on April 2, 2003 to uphold Plaintiff's termination.[15] On May 5, 2003, Plaintiff requested a review by the Deputy Administrator for Field Operations (DAFO). Several letters were thereafter sent to Plaintiff because he had indicated he wanted a hearing before the DAFO and because he needed to notify the agency of his attorney's name.[16] Plaintiff Solomon never provided the name of his attorney nor did he affirm that he wanted to proceed with a hearing. Finally, in a letter dated March 23, 2004, the DAFO dismissed his appeal with prejudice for failure to cooperate with the appeal process.[17] A copy of this letter was sent again on April 6, 2004.[18]

On March 26, 2002, Plaintiff met with an EEO counselor to discuss his claim that he

---

[13]Def. Ex. 12.

[14]Def. Ex. 13.

[15]Def. Ex. 14.

[16]Def. Ex. 15.

[17]Def. Ex. 16.

[18]Def. Ex. 17.

felt he was subjected to discrimination based on race when he was suspended from his position as County Executive Director. Plaintiff filed a formal complaint on May 6, 2002.[19] On October 17, 2002, Plaintiff was notified of the final Agency action upholding his termination.[20] On May 2, 2003, Plaintiff notified the Agency that he elected to have a hearing. However, on January 8, 2004, the Administrative Judge notified the Agency that Plaintiff Solomon had withdrawn his hearing request and returned the Complaint for issuance of a Final Agency Decision (FAD).[21] A FAD was issued on June 21, 2004, with no finding of discrimination. Specifically, the decision noted, "There is not one iota of evidence to support the Complainant's contention that the management officials took adverse action against him based on his race and previous EEO activity. However, there is overwhelming evidence supporting the finding that the [Agency was] frustrated with the Complainant's inability to take the matters concerning his office's operational deficiencies 'seriously.'"[22]

Plaintiff thereafter filed suit in this court alleging discriminatory suspension and termination, based on the same grounds as his administrative complaint. Defendant has moved for summary judgement arguing that Plaintiff's poor performance was a valid, non-discriminatory reason for his termination.

---

[19]Def. Ex. 18.

[20]Def. Ex. 19.

[21]Def. Ex. 20.

[22]Def. Ex. 21, p. 13.

*Summary Judgment Standard*

Summary Judgment is appropriate when the pleadings, depositions and affidavits submitted by the parties show no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The Supreme Court has explained that the moving party's burden may be discharged "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In Celotex, the Court held that summary judgment is appropriate against

> A party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 322-23. "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact." Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). "Summary judgment . . . is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (citing Fed. R. Civ. P. 1; Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of

Material Fact, 99 F.R.D. 465, 467 (1984)).

*Title VII Claims*

Plaintiff Solomon contends he was suspended and terminated because of his race based on his belief that there were Caucasian employees in his same position with problems in their offices who were not suspended or terminated. Plaintiff failed to present any direct evidence of discrimination such as specific statements or conduct by employment decision-makers that reflected a bias or discriminatory animus toward a particular protected class.[23] Therefore, Plaintiff's claims are based on circumstantial evidence and subject to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Koch v. Rugg, 221 F.3d 1283, 1291 n.31 (11th Cir. 2000). Plaintiff is required to present evidence that (1) he is a member of a protected class; (2) he was qualified for the job in question; (3) he was terminated; and (4) an individual who was not a member of his protected class replaced him. Bolton v. Potter, 198 Fed. Appx. 914, 916 (11th Cir. 2006)

---

[23]Plaintiff contends that Grady Shaw, who was elected to the County Office Committee in 2001, on one occasion during a conversation with Plaintiff used the word "nigger." That one alleged use of, albeit an appalling, distasteful word, is a "stray remark" that does not constitute direct evidence of discrimination. First, Shaw was not elected to the COC until 2001, according to Plaintiff, and the audit that served as the basis for Plaintiff's termination was conducted in 1999. Second, there is no evidence that this Mr. Shaw had anything whatsoever to do with Plaintiff's termination or that the comment was made in the context of Plaintiff's employment. See Vickers v. Federal Express Corp., 132 F. Supp.2d 1371, 1378 (S.D. Fla. 2000) ("Racially derogatory statements can be direct evidence if the comments were (1) made by the decision-maker responsible for the alleged discriminatory act and (2) made in the context of the challenged decision. However, if an alleged statement fails either prong it is considered a 'stray remark' and does not constitute direct evidence of discrimination.") (citation omitted). See also Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998) (noting that stray remarks by non-decision-makers alone are insufficient to establish direct evidence of discrimination but may in some instances be used to establish circumstantial evidence if made in the context of the adverse employment action) (quoting Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3rd Cir. 1997)).

(citing McDonnell Douglas Corp., 411 U.S. at 802, Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir.2000)).

Plaintiff Solomon established a prima facie case because he is African-American; for purposes of this order the Court will assume he was objectively qualified for the job in question; he was suspended and eventually terminated; and, he was replaced by a Caucasian individual. Defendant is therefore required to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. If Defendants make this showing, Plaintiff has an opportunity to show that Defendant's stated reasons for his termination are actually pretext for a discriminatory motive. Plaintiff may succeed in this "by persuading the court that a discriminatory reason more likely motivated" the Defendant or by showing that Defendant's proffered explanation is not worthy of belief. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (citation omitted). Plaintiff may establish discrimination if he produces *evidence* that he was treated less favorably than similarly situated employees of a different race *because of* Plaintiff's race. To show that comparator employees are similarly situated, Plaintiff Solomon must show that the employees are similarly situated in all relevant respects. "If an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown." Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1317 n.5 (11th Cir. 2003) (citations omitted). In making these determinations, the Court must be careful to not allow Plaintiff to simply litigate whether he was a good employee. Cain v. Walton County School Dist., 2006 WL 581195, *7 (Mar. 8,

2006 M.D. Ga.) (citing Rojas v. Fla., 285 F.3d 1339, 1342 (11th Cir.2002)).

Plaintiff Solomon contends that he corrected "most of" the errors found in the audit and that he performed his job in the manner he thought was appropriate and therefore should not have been terminated. However, Defendant's interpretation of Solomon's performance is the determinative factor because the decision-makers believed Solomon was not following the proper procedures for running his office. Knight, 330 F.3d at 1318 n.6 (citing Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir.1989) ("The law is clear that, even if a Title VII claimant did not in fact commit the violation, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.")). The Court need not determine that the decision-makers were correct in their assessment of Solomon's performance; it need only determine that they in good faith believed Solomon's performance to be unsatisfactory and that the asserted reason for the discharge is not pretext for discrimination. Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (citations omitted). An employer has a right to interpret its rules as it chooses, "and to make determinations as it sees fit under those rules. [The anti-discrimination statutes only prohibit] discrimination." Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (citation omitted). Often mistaken for more than what it is, most plaintiffs fail to comprehend that "Title VII is not a federal 'civility code.'" Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). While an employee who receives criticism or negative evaluations in the workplace may suffer in

some way, the protections of Title VII simply do not extend to every action that makes an employee unhappy. Davis v. Town of Lake Park, 245 F.3d 1232, 1242 (11th Cir. 2001). The federal courts do not "sit as a super-personnel department that reexamines an entity's business decisions," nor do they "sit to second-guess the business judgment of employers." Id. at 1244 (citations omitted). An employer may "fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix, 738 F.2d at 1187. Courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, [their] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir.1999). The record reflects that the decision-makers in this case in good faith believed Solomon's performance to be unsatisfactory.

In rebuttal of Defendant's non-discriminatory reason for Plaintiff's termination, Plaintiff provided a great deal of speculation and assumptions as to why he was allegedly treated differently from his Caucasian colleagues. However, his belief or feeling that some action by the decision-makers was discriminatory does not show that discrimination actually occurred. Further, the individuals Plaintiff Solomon identified as comparators are not legally relevant comparators. Plaintiff contends that Dot James, a Caucasian female CED in Crawford County, was subjected to a "similar audit that resulted in similar findings" and was transferred to another district. Plaintiff failed to show or explain how Ms. James'

situation was similar to his or whether the audit in her case revealed as many serious deficiencies as the audit of Plaintiff's office. More importantly, there is no evidence she repeatedly failed month after month to correct her deficiencies as the record demonstrates Plaintiff did. Plaintiff also listed several names of individuals who were CEDs in other counties who allegedly had "poor audits." However, he again failed to show that their situations were legally and factually similar in that he failed to present evidence that they were as serious as Plaintiff's errors or that they were as vast as Plaintiff's deficiencies that covered, in the Agency's terms, every major program area. Likewise, Plaintiff failed to present, or even indicate the possible existence of, any evidence that those individuals were repeatedly warned, offered assistance and consistently refused to make all of the required changes as the evidence clearly supports happened with Plaintiff. Plaintiff acknowledged that the September 1999 audit was "routine in that this was a new program and audits throughout the state were being done." Plaintiff's audit was clearly one that caused the Agency great concern on many different levels. In the final administrative decision on Plaintiff's claims, several important facts were presented: two other audits were going on while Plaintiff's was being conducted, one where the CED was an African-American male and one where the CED was a Caucasian female; these other investigations revealed problems "nowhere as bad as those" in Plaintiff's office; the investigation revealed Plaintiff's office made payments that should not have been made; Plaintiff accepted production that was not good production; acreage reports were wrong and forms were not

completed; what was going on in Plaintiff's office was "really bad" because normally there would have been about 30 findings for a county that size that needed correction whereas Plaintiff had more than 200; one reviewer said the situation in Plaintiff's office was the "worst review" he had ever conducted because of the magnitude of the problems involved and he had been conducting audits for 36 years; and, the District Director, who is African-American,[24] said he had no idea how bad the problem was until after Plaintiff was suspended and that, after he started "working behind" Plaintiff and researching the issue, he discovered some information was being falsified by Plaintiff.[25]

Defendant provided a non-discriminatory reason for Plaintiff Solomon's termination - poor performance - and the record is replete with evidence to support this reason for Plaintiff's termination. Complaints from farmers compounded with the numerous deficiencies in the county for which Plaintiff was responsible were of such magnitude that the Agency was compelled to monitor the progress of its corrections more closely which led to Plaintiff's termination for failure to correct the deficiencies, failure to follow instructions and improper conduct. Plaintiff acknowledged that 222 findings were made regarding areas in which his office was performing poorly or had failed to follow procedure but argues this was not a basis for suspending or terminating him because there was no evidence of fraud, significant costly errors, misconduct or deliberate wrongdoing. However, Plaintiff's

---

[24]Def. Ex. 21, p. 13.

[25]Def. Ex. 21, pp.5-6.

13

self-assessment of his abilities does not constitute evidence legally sufficient to support a viable claim of discrimination. Plaintiff failed to establish that the reasons articulated by the Agency were not its true reasons for its actions and the Agency's reasons are well supported by the record. Because Plaintiff failed to rebut Defendant's non-discriminatory reason for his termination, Plaintiff's discrimination claims must be dismissed.

### *Retaliation Claims*

Plaintiff Solomon also claims he was suspended and eventually terminated because of his EEO complaint and because his mother and brother were part of a class action settlement in Pigford, a class action filed in the U.S. District Court for the District of Columbia that alleged the Agency had discriminated against African-American farmers in the administration and awards of loans. Plaintiff argues the Agency knew about his mother's and brother's involvement in the class action because a list of the more than 600 class action claimants was circulated throughout the Agency in October of 1999.

To establish a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between his protected activity and the adverse employment action. Bass v. Board of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1117 (11th Cir. 2001) (citations omitted). "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." Id. at 1119 (citations omitted).

14

"An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Bass, 256 F.3d at 1118 (citations omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (citation omitted).

> Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance. Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee. Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely – without more – establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause.

Id. at 1242. "Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities. The same concern exists for public entities . . . which must balance limited personnel resources with the wide variety of critically important and challenging tasks expected of them by the public." Id. at 1244 (discussing transfer to a different department).

"Once a plaintiff makes out a prima facie case of retaliation the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." Johnson v. Booker T. Washington Broadcasting Service, 234 F.3d 501, 507 n.6 (11th Cir. 2000). "If the defendant offers legitimate reasons, the presumption of retaliation disappears. The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." Id. (citations omitted).

It is unclear whether the decision-makers in this case actually knew Plaintiff's family members were part of the Pigford case. However, for purposes of this discussion, the Court will assume Plaintiff established a prima facie case of retaliation based on: (1) he engaged in the protected activity of filing an EEO complaint <or> because of his family's involvement in a discrimination lawsuit; (2) he suffered an adverse employment action when he was suspended and terminated; and (3) there was a temporally causal link between his protected activity and the adverse employment actions in that his EEO complaint was filed during the course of his suspension and termination. Nevertheless, as discussed above, the Agency has established a legitimate, non-discriminatory reason for Plaintiff's suspension and termination - numerous, serious and repeated violations of Agency policy. Further, the Agency provided Plaintiff more than ample opportunity to correct the deficiencies discovered in the 1999 NAP Target Review and to improve the performance within the County for which he was responsible. Plaintiff's allegations rest on his perception that the

Agency was not supportive of him in his position as the County Executive Director. However, the Agency is not legally required to be "supportive" of him and he failed to otherwise show how the Agency's actions constituted discriminatory retaliation. Although Plaintiff's retaliation claim seems to really be based on his belief that he was being punished for his mother's and brother's participation in the Pigford case, there is no evidence the decision-makers in this case made that connection and the record produced in this case shows the documented, serious deficiencies in Plaintiff's office. Plaintiff having members of his family participate in a lawsuit does not mean he was thereby insulated from termination for serious performance problems. Because Plaintiff failed to rebut the non-discriminatory reason for his suspension and termination, his allegation of discrimination on the basis of reprisal for his EEO complaint and his family members' participation in the class action lawsuit must be dismissed.

### *Conclusion*

Because Plaintiff Solomon failed to present evidence of a discriminatory motive for his suspension and termination and failed to establish a retaliation claim, his claims are dismissed and Defendant's motion for summary judgment is GRANTED.

**SO ORDERED this 1st day of March, 2007.**

**S/**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**